# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ALBANY DIVISION

ANGEL MANUEL ORTIZ, by and through :
the Administrator of his Estate, SANDRA :
OUTLER, :
                           :
       Plaintiff, :
                           :
v. :     CASE NO.: 1:21-CV-49 (LAG)
                           :
STATE OF GEORGIA DEPARTMENT :
OF CORRECTIONS, *et al.*, :
                           :
       Defendants. :
_____ :

## <u>ORDER</u>

       Before the Court is Defendants' Motion for Summary Judgment (Doc. 67). For the reasons below, Defendants' Motion is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

       This case arises out of the death of Angel Manuel Ortiz at Calhoun State Prison (CSP) and was brought by Plaintiff Sandra Outler, the administrator of Mr. Ortiz's estate. (*See* Docs. 1, 44). Mr. Ortiz was an inmate at CSP. (Doc. 67-2 ¶ 1; Doc. 72-3 ¶ 1).[1] He was sixty years old when he died and had an unspecified disability that required him to walk using a cane. (Doc. 72-3 ¶ 46; Doc. 67-5 at 7:11–17; Doc. 72-4 at 1). Defendant Officers Derrical Bell, Kelly Cooper, Timothy Davis, Keyani Graham, and Jabreon Price worked as correctional officers at CSP during the relevant time period—between May and June 2019. (Doc. 67-2 ¶ 2; Doc. 72-3 ¶ 2). In late May 2019, Mr. Ortiz left CSP to appear in Pulaski County State Court. (Doc. 67-2 ¶ 3; Doc. 72-3 ¶ 3). He returned to CSP on May

---

[1]     The relevant facts are derived from the Parties' Statements of Material facts, Plaintiff's Response to Defendant's Statement of Material Facts, and the record in this case. (*See* Docs. 67-1, 72-3). When evaluating the Motion for Summary Judgment, the Court construes the facts in the light most favorable to Plaintiff, the nonmoving party. *See* Fed. R. Civ. P. 56; *Jacoby v. Baldwin County*, 835 F.3d 1338, 1342 (11th Cir. 2016) (citation omitted).

30, 2019. (Doc. 67-2 ¶ 4; Doc. 72-3 ¶ 4). Per CSP protocol, Mr. Ortiz was initially assigned to administrative segregation in Building J. (Doc. 67-2 ¶ 5; Doc. 72-3 ¶ 5). Mr. Ortiz was assigned to Cell J-1-111, which he was to share with Frank Hardy, another inmate. (Doc. 67-2 ¶ 6; Doc. 72-3 ¶ 6). Mr. Hardy had a history of disciplinary issues. In the preceding six months, Mr. Hardy was moved to different housing at CSP four times where the "[m]ove [r]eason" was listed as "disciplinary[.]" (Doc. 67-4 at 1). Defendant Bell placed Mr. Hardy in the cell a few weeks earlier, on May 12, 2019, after Mr. Hardy "refus[ed] housing." (Doc. 72-7 at 1; Doc. 72-3 at 9, ¶¶ 5–6; Doc. 67-4 at 1; Doc. 67-9 at 9:10–20). According to Robert Baker, an inmate who lived in the J building at the time, Defendant Bell had to drag Mr. Hardy, who was "screaming and hollering[,]" "wrestle[] him[, l]ock[] his arms," and sl[i]ng him in" the cell. (Doc. 72-13 at 6:8–12, 8:11–14). After being placed in the cell, Mr. Hardy "r[an] to the door, kicking the door, screaming and hollering." (*Id*. at 9:5–7). Kevin Kelliebrew, another in inmate who worked in the administrative segregation unit, testified that Mr. Hardy was "agitated" when Defendant Bell brought him into the cell and that "[h]e was angry because he was under the influence of this substance that [some inmates] use called Strips." (Doc. 67-9 at 9:21–24).

On May 30, Defendant Cooper escorted Mr. Ortiz to Building J; and, once there, Defendant Bell assisted Defendant Cooper in placing Mr. Ortiz in his cell. (Doc. 67-2 ¶¶ 7–8; Doc. 72-3 ¶¶ 7–8). Mr. Hardy stated that he did not want to share a cell with anyone and threatened to harm Mr. Ortiz. (Doc. 67-2 ¶ 9; Doc. 72-3 ¶ 9). The Parties dispute the exact nature of the threat made by Mr. Hardy. (Doc. 67-2 ¶ 9; Doc. 72-3 ¶ 9). According to Plaintiff, Mr. Hardy threatened to kill Mr. Ortiz. (Doc. 72-3 ¶ 9). Inmate Kelliebrew, who witnessed the scene, testified that Mr. Hardy said, "If you put me in the cell with somebody I'm going to kill him." (Doc. 67-9 at 10:16–18). Another inmate, Baker, testified that Mr. Ortiz was holding onto the side of the door "screaming please don't put me in there" while Mr. Hardy was "screaming, you put him in there I'm going to kill him." (Doc. 72-13 at 10:1–8). According to Defendant Bell's deposition testimony, "[t]here were no issues" when he put Mr. Ortiz in the cell, and Mr. Hardy "never said" that he would kill Mr. Ortiz if he was put in the cell with Mr. Hardy "or anything of that nature." (Doc. 67-5

at 6:8–17). Defendant Cooper, on the other hand, testified that she did not hear Mr. Hardy say that he would kill anyone but heard Mr. Hardy say that he would "jump on" Mr. Ortiz. (Doc. 67-6 at 7:6–23). He testified that no "inmate . . . want[s] a roommate" and "every inmate" says that they will fight their cellmate so that they can have a cell to themselves. (*Id.* at 7:8–23, 8:13–17). Inmate Baker stated that Mr. Ortiz pleaded with the officers not to put him in a cell with Mr. Hardy because he was "on the[] strips[,]" a common drug in the prison, and was "going to hurt" Mr. Ortiz. (Doc. 72-13 at 9:20–22). Defendant Cooper testified that Defendant Bell spoke to Mr. Ortiz and Mr. Hardy. (Doc. 67-6 at 15:18–16:3). He could not hear what they said but Defendant Bell told him that Mr. Ortiz and Mr. Hardy were "all right." (*Id.*). He further testified that he reported Mr. Hardy's threat. (*Id.* at 8:13–17). Ultimately, Defendants assert that either no threat was made or that the treat was to jump not kill Mr. Ortiz; but they concede, for purposes of summary judgment that Mr. Hardy "made a verbal threat of violence against [Mr.] Ortiz." (Doc. 67-1 at 8).

Mr. Ortiz and Mr. Hardy were cellmates from May 30, 2019 through June 6, 2019. (Doc. 67-2 ¶ 12; Doc. 72-3 ¶ 12). Evidence in the record indicates that a dispute arose between Mr. Hardy and Mr. Ortiz regarding who slept on the bottom bunk of the bunk bed. (*See* Ex. O, James Turner Interview, at 2:00–3:15). An inmate who lived next door to Mr. Ortiz and Mr. Hardy, stated in an interview with a Georgia Department of Corrections (GDC) investigator, that Defendant Bell had to threaten to use mace on Mr. Hardy to get him to relinquish the bottom bunk that Mr. Ortiz was entitled to due to his disability. (*Id.*). There is no evidence in the record that Defendants Davis, Graham or Price witnessed any disagreements between Mr. Ortiz and Mr. Hardy prior to June 6th. (*See* Doc. 67-2 ¶ 14; Doc. 72-3 ¶ 14).

On June 6, the day of the attack, Defendant Davis worked the day shift at Building J, and Defendants Graham and Price worked the night shift. (Doc. 67-2 ¶¶ 15–17; Doc. 72-3 ¶¶ 15–17). Defendant Davis did not notice any issues between Mr. Ortiz and Mr. Hardy during the day shift. (Doc. 67-2 ¶ 16; Doc. 72-3 ¶ 16). During the night shift, Defendant Graham was assigned to J-1; and Defendant Price was assigned to J-2. (Doc. 67-2 ¶ 18;

Doc. 72-3 ¶ 18). Defendants Graham and Price took turns doing rounds in their assigned buildings while the other remained in the control room. (Doc. 67-2 ¶ 19; Doc. 72-3 ¶ 19).

Prison surveillance video submitted to the Court shows that, at approximately 6:36 PM, an orderly went to notify Defendant Graham that Mr. Hardy and Mr. Ortiz were fighting. (Ex. O, Surveillance Video, at 6:36:00–20). Defendant Graham arrived less than thirty seconds later. (Ex. O, Surveillance Video, at 6:36:16–6:36:45). Defendant Graham went to the cell door and peered in through the tray flap. (Doc. 67-2 ¶ 21; Doc. 72-3 ¶ 21; Doc. 67-8 at 23:1–11). She saw Mr. Hardy attacking Mr. Ortiz—repeatedly jumping on his head and kicking him. (Doc. 67-2 ¶ 22; Doc. 72-3 ¶ 22; Doc. 67-8 at 23:14–20). Defendant Graham immediately radioed for assistance. (Doc. 67-2 ¶ 23; Doc. 72-3 ¶ 23). She also commanded Mr. Hardy to stop and kept watching to "get an eye on the incident . . . as [she] was trained to do." (Doc. 67-2 ¶ 24). Defendant Price answered the radio call. (Doc. 67-2 ¶ 25; Doc. 72-3 ¶ 25). She arrived at the scene at 6:38 PM. (Ex. O, Surveillance Video, at 6:38:10–15). Defendant Price commanded Mr. Hardy to stop several times through the tray flap. (Doc. 67-2 ¶ 26; Doc. 72-3 ¶ 26; Doc. 67-10 at 25:10–18). Defendant Price testified that when she arrived at the scene, Defendant Graham said, "I can't look at it. Can you please try to help," and then "went back upstairs because she was doing her [beginning of shift cell] checks." (Doc. 67-10 at 21:22–23, 22:19–21). On the surveillance video seconds after Defendant Price's arrival, an officer, who appears to be Defendant Graham based on Price's testimony, walked upstairs to the second floor of cells, and, for the next minute and a half before backup arrived, checked on inmates in different cells throughout the room. (Ex. O, Surveillance Video, at 6:38:25–6:40:02 PM; *see also* Ex. O, Defendant Graham Interview, at 13:50–14:00, 15:58–16:06).

The Parties do not dispute that both Defendants Graham and Price waited to physically intervene until more officers arrived at the scene. (Doc. 67-2 ¶¶ 21–28; Doc. 72-3 ¶¶ 21–28). According to Defendant Price, she and Defendant Graham were "not authorized to open the door at all" and "ha[d] to wait until a sergeant, lieutenant, captain, [or] anybody who[ is] higher ranking to come down to open the doors." (Doc. 67-10 at 41:3–8). She also testified that she did not "have anything but the radio. So [she] wasn't

going to be able to defend [her]self at all anyway." (*Id.* at 42:13–16). "[T]he sergeant . . . [had] the pepper spray and the tasers and . . . everything [one would] need" to intervene in an attack. (*Id.* at 43:1–4). Defendant Graham testified that she and Defendant Price waited for backup to intervene because they were both women and could not "physically restrain a man." (Doc. 67-8 at 27:9–18).

By the time more officers arrived at the scene, Mr. Hardy had stopped beating Mr. Ortiz. (Doc. 67-2 ¶ 28; Doc. 72-3 ¶ 28). The additional officers arrived at approximately 6:40 PM and removed Mr. Hardy from the cell at 6:41:46 PM. (Ex. O, Surveillance Video, at 6:40–6:42 PM). One of the newly arrived officers, Sergeant Williams, called for medical assistance. (Doc. 67-2 ¶¶ 29–30; Doc. 72-3 ¶¶ 29–30). The officer who left the cell door to do checks, who based on the record evidence seems to be Defendant Graham, did not rejoin the officers at Mr. Ortiz's cell until 6:41 PM. (Ex. O, Surveillance Video, at 6:41:23). Mr. Ortiz was transferred to Phoebe Putney Memorial Hospital and then to Navicent Health where he died. (Doc. 67-2 ¶ 31; Doc. 72-3 ¶¶ 31, 49).

Plaintiff Sandra Outler, the administrator of Mr. Ortiz's estate, filed this § 1983 action on March 30, 2021. (Doc. 1). On March 11, 2022, Plaintiff filed an amended complaint bringing Eighth Amendment deliberate indifference claims against the Georgia Department of Corrections, the Warden of Calhoun State Prison, and several correctional officers, including Defendants Keyani Graham, Jabreon Price, Derrical Bell, Kelly Cooper, and Timothy Davis.[2] (Doc. 44). Plaintiff's claim against Defendants Bell, Cooper, and Davis assert that they failed to protect Mr. Ortiz from the threat Mr. Hardy posed, and the claim against Defendants Graham and Price asserts that they failed to intervene when Mr. Hardy attacked Mr. Ortiz. (*Id.* ¶¶ 28–56). Defendants filed a Motion to Dismiss (Doc. 48), and, on March 15, 2023, the Court granted the motion in part and denied the motion in part. (Doc. 57). The Court dismissed all claims against the Georgia Department of Corrections and the Warden of Calhoun State Prison. (*Id.* at 14). The Court also dismissed the claims against Defendants Graham, Price, Bell, Cooper and Davis in their official capacities. (*Id.*).

---

[2]      The Court dismissed the original Complaint as a shotgun pleading on February 18, 2022 and provided Plaintiff an opportunity to file an amended complaint. (Doc. 43 at 3).

The Court, however, denied the Motion to Dismiss as to the claims against Defendants Graham, Price, Bell, Cooper, and Davis in their individual capacities. (*Id.*).

On March 7, 2024, Defendants filed the Motion for Summary Judgment. (Doc. 67). Plaintiff responded on April 8, 2024. (Doc. 69–72). Defendants did not file a reply brief. (*See* Docket). Defendants filed a Notice of Supplemental Authority on August 30, 2024; and, after receiving leave from court, Plaintiff filed a response to the Notice of Supplemental Authority on November 12, 2024. (Docs. 78–81). Accordingly, the Motion for Summary Judgment is ripe for review. *See* M.D. Ga. L.R. 7.3.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (citation omitted). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the non-moving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th

Cir. 2018); *Whitehead*, 979 F.3d at 1328. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs.*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). If the movant meets their initial burden, the non-moving party must demonstrate that there is a genuine dispute for trial. *Whitehead*, 979 F.3d at 1328 (citing *Celotex Corp.*, 447 U.S. at 324). "The nonmovant is required to go beyond the pleadings and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (citing *Celotex*, 477 U.S. at 324).

## DISCUSSION

Defendants seek summary judgment as to Plaintiff's remaining individual capacity deliberate indifference claims against Defendants Graham, Price, Bell, Cooper, and Davis on the basis that they are protected by qualified immunity. (*See* Doc. 67-1). "Qualified immunity protects government officers acting within their discretionary authority from liability for civil damages unless a plaintiff can show (1) that the officer violated a federal statutory or constitutional right, and (2) that the unlawfulness of the officer's conduct was clearly established at the time." *Wade v. Daniels*, 36 F.4th 1318, 1323 (11th Cir. 2022) (citing *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020)). A federal statutory or constitutional "right is clearly established if" (1) the U.S. Supreme Court, "the Eleventh Circuit, or the applicable state supreme court" has decided "a case with" "materially similar" facts; "(2) a broader, clearly established principle controls the facts of the situation; or (3) the conduct so obviously violates the constitution that prior case law is unnecessary." *Id.* (citing *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017)). If issues of material fact exist, courts resolve them "in favor of the plaintiff." *Id.* (quoting *Alston v. Swarbrick*, 954 F.3d 1312, 1317–18 (11th Cir. 2020)).

To receive the benefit of qualified immunity, a government actor must first establish "that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). Here, Plaintiff does not dispute that the Defendant officers were acting within the scope of their discretionary authority while performing their duties as CSP correctional officers during the relevant time period. (Doc. 44 ¶¶ 7–11; *see* Doc. 72 at 13). Plaintiff therefore bears the burden of showing that the defendant officers are not entitled to qualified immunity. *See Wade*, 36 F.4th at 1323 (citing *Williams*, 965 F.3d at 1156). Accordingly, to prevail, Plaintiff must show (1) that Defendants' conduct violated Mr. Ortiz's constitutional right, and (2) that right was clearly established at the time of the alleged violation. *See Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1319 (11th Cir. 2016) (citation omitted).

Plaintiff brings Eighth Amendment deliberate indifference claims against all five officers in their individual capacities. (*See* Doc. 44). The Eighth Amendment's proscription against cruel and unusual punishment governs the treatment of convicted prisoners while in prison. *Farmer v. Brennan*, 511 U.S. 825, 832–34 (1994) "[A] prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment if [the official] is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (per curiam) (second alteration in original) (quoting *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016)). "[A] prison official violates the Eighth Amendment only when two requirements are met." *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (quoting *Farmer*, 511 U.S. at 934). First, "the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, 'objectively, "sufficiently serious."'" *Id.* at 1262 (quoting *Farmers*, 511 at 834). The second element—deliberate indifference—is the "subjective component" of an Eighth Amendment claim. *Farmer*, 511 U.S. at 837–39 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The Plaintiff must establish that the defendant had the requisite mental state— that the defendant was deliberately indifferent to the objective risk of harm. *Wade*, 106 F. 4th at 1262. To do so a plaintiff must (1) "prove that the [defendant] was subjectively aware

that the inmate was at risk of serious harm"; (2) "must show that the [defendant] disregarded that risk"; and (3) "must demonstrate that the defendant acted with subjective recklessness as used in the criminal law[.]" *Id.* at 1255 (first quoting *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020); and then quoting *Farmer*, 511 U.S. at 839).

To demonstrate "subjective recklessness as used in the criminal law[,]" a plaintiff "must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff[.]" *Id.* at 1262 (quoting *Farmer*, 511 U.S. at 839). Subjective awareness requires that a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he also must draw that inference." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 837). Additionally, "[e]ven if the defendant 'actually knew of a substantial risk to inmate health or safety,' he 'cannot be found liable under the Cruel and Unusual Punishment Clause' if he 'responded reasonably to the risk.'" *Wade*, 106 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 844–845). A Plaintiff can overcome this element by showing that the defendant "responded to the known risk in an unreasonable manner, in that he or she 'knew of ways to reduce the harm' but knowingly or recklessly declined to act." *Marbury*, 936 F.3d 1227, 1233 (11th Cir. 2019) (quoting *Rodriguez*, 508 F. 3d at 620).

Finally, Plaintiff must establish the "'necessary causal link' between [the Defendants'] failure to act reasonably and the plaintiff's injury." *Marbury*, 936 at 1233 (quoting *Rodriguez*, 508 F.3d at 622–23). "This causal element requires proof that the officer '(1) had the means substantially to improve the inmate's safety, (2) knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded.'" *Nelson v Thompkins*, 89 F.4th 1289, 1298 (11th Cir. 2024) (quoting *Rodriguez*, 508 F.3d at 622).

## I.    Failure to Protect Claim Against Defendants Bell and Cooper

Plaintiff brings a failure to protect claim against Defendants Bell and Cooper, the officers who placed Mr. Ortiz in the cell with Mr. Hardy, in their individual capacities. (Doc. 44 ¶¶ 43–44). According to Plaintiff, when Defendants Bell and Cooper were trying to place Mr. Ortiz in the cell with Mr. Hardy, Mr. Ortiz was holding onto the side of the door "screaming, please don't put me in there" while Mr. Hardy was "screaming, you put him in there I'm going to kill him." (Doc. 72-13 at 10:1–8; *see also* Doc. 72 at 7–8). A week later, Mr. Hardy killed Mr. Ortiz. (Doc. 67-2 ¶¶ 20–31; Doc. 72-3 ¶¶ 20–31). Thus, Plaintiff argues that Defendants Bell and Cooper knew of the particular threat Mr. Hardy posed to Mr. Ortiz and "showed deliberate indifference to the welfare and safety of Mr. Ortiz." (Doc. 44 ¶¶ 43–46). Defendants argue that they are entitled to qualified immunity on these claims. (Doc. 67, 67-1).

Threats between inmates are commonplace and thus, "[n]ot 'every injury suffered by one prisoner at the hands of another . . . translates into a constitutional liability for prison officials responsible for the victim's safety.'" *Mosley v. Zachery*, 966 F.3d 1265, 1276 (11th Cir. 2020) (omission in original) (quoting *Bowen*, 826 F.3d at 1320). Prison "officials must possess enough details about a threat to enable them to conclude that it presents a 'strong likelihood' of injury, not a 'mere possibility.'" *Marbury*, 936 F.3d at 1236 (citations omitted). Plaintiff, thus, must show that Mr. Ortiz "suffered a deprivation that was, 'objectively, "sufficiently serious[,]"'" and that he suffered that deprivation because Defendants Bell and Cooper were deliberately indifferent to risk of serious harm—in this case the risk of harm from putting Mr. Ortiz in the cell with Mr. Hardy after Mr. Hardy threatened Mr. Ortiz. *Wade*, 106 F.4th at 1262 (quoting *Farmers*, 511 at 834). "Whether prison officials had the requisite awareness of the risk 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (quoting *Farmer*, 511 U.S. at 842). "[B]efore Defendants' awareness arises to a sufficient level of culpability, there must be much more than a mere awareness of [another inmate's]

generally problematic nature." *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam).

First, considering the elements of a failure to protect, deliberate indifference claim, Plaintiff must establish that Mr. Ortiz suffered a deprivation that was, "objectively, 'sufficiently serious,'" meaning that "a prison official's act or omission must result in the denial of the 'minimal civilized measure of life's necessities[.]'" *Farmer*, 511 U.S. at 834 (citations omitted). "For a claim (like the one here) based on a failure to prevent harm, [the Plaintiff] must show that [Mr. Ortiz was] incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). To meet this element the Plaintiff must "at the very least show that a condition of [Mr. Ortiz's] confinement 'pose[d] an unreasonable risk of serious damage to [Mr. Ortiz's] future health' or safety[.]" *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (quoting *Helling*, 509 U.S. at 35). Construing the facts in the light most favorable to Plaintiff, housing Mr. Ortiz in a cell with a person who threatened to kill him and who previously had been violent constituted an objectively sufficiently serious risk of damage to Mr. Ortiz's future safety. The Court, therefore, must consider whether (1) Defendants Cooper and Bell were "subjectively aware that [Mr. Ortiz] was at risk of serious harm"; (2) they "disregarded that risk[,]" (3) they "acted with 'subjective recklessness as used in the criminal law[,]'" and (4) the "necessary causal link" has been established. *Wade*, 106 F. 4th at 1255 (first quoting *Hoffer*, 973 F.3d at 1270; and then quoting *Farmer*, 511 U.S. at 829); *Marbury*, 936 at 1233 (quoting *Rodriguez*, 508 F.3d, at 622–23). Furthermore, Defendants Bell and Cooper "'cannot be found liable under the Cruel and Unusual Punishment Clause' if [they] 'responded reasonably to the risk.'" *Wade*, 106 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 844–45).

### A. Defendant Bell

To survive summary judgment regarding the failure to protect claim against Defendant Bell, Plaintiff must present evidence that Defendant Bell was deliberately indifferent to the substantial risk of harm to Mr. Ortiz and that there was a causal connection between his actions and the harm. *Wade*, 106 F.4th at 1255. Construing the

evidence in the light most favorable to Plaintiff, Defendant Bell was "actually, subjectively aware that his own conduct caused a substantial risk of serious harm" to Mr. Ortiz and disregarded that risk of harm when he placed Mr. Ortiz in the cell with Mr. Hardy. *Id.* at 1262; (Doc. 67-2 ¶ 9; Doc. 72-3 ¶ 9; Doc. 67-9 at 10:1–18). While Defendant Bell, in his deposition testimony, denied that Mr. Hardy made any threat against Mr. Ortiz and asserted that Mr. Hardy "was just sitting on his bunk" when he put Mr. Ortiz in the cell, according to other witnesses, Mr. Hardy threatened to kill Mr. Ortiz, and Mr. Ortiz begged to not be placed in the cell. (Doc. 67-5 at 6:3–7:5; Doc. 72-13 at 10:1–8). Defendant Cooper also testified that Mr. Hardy initially threatened to "jump on [Mr. Ortiz]." (Doc. 67-6 at 7:21–23). Defendant Cooper testified that Defendant Bell talked to the two inmates and told Defendant Cooper that "they[ we]re all right" before they left them in the cell together—evincing an awareness that a serious threat was made. (*Id.* at 15:18–22). Moreover, Defendants concede for purposes of summary judgment that a threat of violence was made. (Doc. 67-1 at 8). Furthermore, Defendant Bell knew that Mr. Ortiz was particularly vulnerable as an older man walking with a cane. (Doc. 67-5 at 7:11–13).

When considered alongside Defendant Bell's prior knowledge of Mr. Hardy's violence, Defendant was subjectively aware that Mr. Hardy's threat posed a substantial risk of harm to Mr. Ortiz. For example, according to Inmate Baker, when Defendant Bell moved Mr. Hardy to the cell, he had to drag Mr. Hardy, who "was screaming and hollering[,]" "wrestle[] him[, l]ock[] his arms," and sl[i]ng him" into the cell and, after being placed in the cell, Mr. Hardy "r[an] to the door[,] kicking the door, screaming and hollering." (Doc. 72-13 at 6:8–12; 8:11–14; 9:5–7). Moreover, Inmate Kelliebrew testified that Mr. Hardy was "agitated" when Defendant Bell brought him into the cell and that "[h]e was angry because he was under the influence of this substance that [some inmates] use called Strips." (Doc. 67-9 at 9:21–24). Defendant Bell also had occasion to observe Mr. Hardy's hostility towards Bell before the fatal beating. Inmate Turner testified that while Mr. Hardy and Mr. Ortiz lived together issues arose between them because Mr. Hardy wanted the bottom bunk, and Defendant Bell had to threaten to spray Mr. Hardy with mace to get Mr. Hardy

surrender the bottom bunk to Mr. Ortiz, who was entitled to it based on his disability. (Ex. O, James Turner Interview, at 2:00–3:15).

Construing the evidence in the light most favorable to Plaintiff and considering that, after Mr. Hardy threatened Mr. Ortiz and before leaving the two in the cell together, Defendant Bell checked in with Mr. Ortiz and Mr. Hardy and assured Defendant Cooper that they were all right and considering that Defendant Bell knew of Mr. Hardy's violent tendencies, a reasonable jury could find that Defendant Bell was subjectively aware of the "facts from which the inference could be drawn that [there was] a substantial risk" that Mr. Hardy would carry out the threat and harm Mr. Ortiz and "also dr[ew] [that] inference[.]" *Rodriguez*, 508 F.3d at 622 (citation omitted); *see also Garrison v. Ivey*, No. 5:23-cv-00348-TES-CHW, 2024 WL 5325581, at *9–10 (M.D. Ga. Nov. 27, 2024) (finding officer was not entitled to qualified immunity where inmate told officer defendant that his cellmate had threatened to kill him, the officer responded that he would get help, the officer did not return, and the inmate was subsequently attacked by cellmate with a shiv). Thus, a reasonable jury could find that Defendant Bell acted with subjective recklessness under the criminal law. *Wade*, 106 F.4th at 1255.

As discussed above, even accepting that Defendant Bell disregarded a risk of substantial harm to Mr. Ortiz, Defendant Bell cannot be found liable under the Cruel and Unusual Punishment Clause' if [he] 'responded reasonably to the risk.'" *Id.* at 1262. A prison "official responds to a known risk [of serious harm] in an objectively unreasonable manner if 'he knew of ways to reduce the harm but knowingly declined to act' or if 'he knew of ways to reduce the harm but recklessly declined to act.'" *Rodriguez*, 508 F.3d at 620 (quoting *Hale v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir. 1995)). A plaintiff is not required to "show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842 (citations omitted). Defendant Bell testified that if he had heard of a threat to Mr. Ortiz's life, he would have had the authority to stop the process of putting Mr. Ortiz in the cell with Mr. Hardy to discuss the issue with a supervisor: "[I]f . . . I have an issue like that, I[ am] going

13

to notify [a supervising officer], hey, we got a situation down here" and "we will just have to let the supervisor know what[ is] going on before I put him inside that cell." (Doc. 67-5 at 20:4–20). Defendant Bell further testified: "I wouldn't dare stick another offender in [the cell], especially if they have told me what they are going to do, like that." (*Id.* at 21:5–7). Viewing the facts in the light most favorable to Plaintiff, Defendant Bell knew of a way to reduce the harm to Plaintiff—by reporting the conduct and waiting to put Mr. Ortiz in the cell until after he heard back regarding that report. Thus, a reasonable jury could find that Defendant Bell did not reasonably respond to the threat because he declined to take action he knew he could take to reduce the harm.

Defendants argue that no reasonable jury could find a causal connection between Defendant Bell's actions and the attack because the attack did not occur until one week after Defendants Bell and Cooper put Mr. Ortiz in the cell with Mr. Hardy. (Doc. 67-1 at 8–9). In support of this argument, Defendants cite a case in the Northern District of Alabama where the court found that a two-week gap between the defendant's knowledge of a threat and an attack was too attenuated and granted summary judgment in favor of the defendant officers. (*Id.*); *Stallworth v. Graham*, No. 4:14-cv-00134-RDP-HGD, 2015 U.S. Dist. LEXIS 105806, at *12–14 (N.D. Ala. July 17, 2015), *R&R adopted*, 2015 U.S. Dist. LEXIS 105041 (N.D. Ala. Aug. 11, 2015). First, decisions of other district courts in this circuit are persuasive rather than mandatory authority. Second, the temporal gap in this case is one week—half the temporal gap in *Stallworth*. *See id.* Defendant cites no mandatory authority stating that a one-week long gap between knowledge of a threat and an attack is too attenuated as a matter of law to create a genuine dispute of fact regarding causation for a deliberate indifference claim, and this Court is aware of none. Rather, the Eleventh Circuit has explained that the Plaintiff must prove that the defendant officer "(1) had the means substantially to improve the inmate's safety, (2) knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded." *Nelson*, 89 F.4th at 1298 (quoting *Rodriguez*, 508 F.3d at 622). As discussed above, there is evidence on the record that Defendant Bell could have at least paused Mr. Ortiz's

14

placement in the cell with Mr. Hardy and told supervisors of the threat and that he knew that he had the option to do so. (Doc. 67-5 at 20:4–21:10). A reasonable jury could find that Defendant Bell knew of other means to reasonably protect Mr. Ortiz, knew that leaving the inmates together after the threat would be insufficient to protect Mr. Ortiz, and disregarded the means available to him to reduce the risk of harm to Mr. Ortiz. Accordingly, Plaintiff has established a constitutional violation.

Finally, "it was clearly established that an officer violates [the] duty [to protect] if 'he knows that one prisoner poses a substantial risk of serious harm to another, yet fails to take any [reasonable] action' to separate them." *Nelson*, 89 F.4th at 1299 (third alteration in original) (quoting *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1102 (11th Cir. 2014)); *see also Garrison*, 2024 WL 5325581, at *9–10 (finding that Defendant was not entitled to qualified immunity citing *Nelson*). Thus, if a jury finds that Defendant knew that Mr. Hardy posed a substantial risk to Mr. Ortiz and failed to take any reasonable action to separate them, Defendant Bell violated clearly established Eleventh Circuit precedent. "This does not mean, of course, that [Defendant] will not ultimately be entitled to immunity." *Smith v. Maddox*, 127 F.3d 1416, 1420 (11th Cir. 1997) (per curiaum). "If a jury, for example through special interrogatories, indicates that it believes" that Defendant Bell did not hear the threat to Plaintiff or responded reasonably to the threat, the Court can revisit the issue of qualified immunity. *See id.*; *see also id.* n.12 (noting that a "district court may grant qualified immunity following trial based on [a] jury's fact findings." (citing *Stone v. Peacock*, 968 F.2d 1163, 1166 (11th Cir. 1992) (per curiam))). Accordingly, Defendant Bell is not entitled to qualified immunity on the failure to protect claim.

### B. Defendant Cooper

To survive summary judgment regarding the failure to protect claim against Defendant Cooper, Plaintiff must present evidence that Defendant Cooper was deliberately indifferent to a substantial risk of harm to Mr. Ortiz and of a causal connection between his actions and the harm. *Wade*, 106 F.4th at 1255. To demonstrate deliberate indifference, Plaintiff must demonstrate (1) that Defendant Cooper was "subjectively aware that [Mr. Ortiz] was at risk of serious harm" from Mr. Hardy; (2) he "disregarded that risk[,]" and

(3) he "acted with subjective recklessness as used in the criminal law[.]" *Id.* (quotations and citations omitted). Moreover, Defendant Cooper "'cannot be found liable under the Cruel and Unusual Punishment Clause' if he 'responded reasonably to the risk'" or if the "necessary causal link" between Defendant Cooper's conduct and the harm has not been established. *Id.* at 1262 (quoting *Farmer*, 511 U.S. at 829); *Marbury*, 936 at 1233 (quoting *Rodriguez*, 508 F.3d, at 622–23).

Construing the evidence in the light most favorable to Plaintiff, the nonmoving party, Defendant Cooper was subjectively aware of a substantial risk of harm to Mr. Ortiz, did not respond reasonably to the risk, and there was a causal connection between his actions and the harm to Mr. Ortiz. *Wade*, 106 F.4th at 1255. Defendant Cooper argues that he was not deliberately indifferent to Mr. Ortiz's safety when he put Mr. Ortiz in the cell with Mr. Hardy because, although Defendant Cooper heard Mr. Hardy threaten to "jump on" Mr. Ortiz, he did not take the threat seriously because "every inmate" says that they will fight with their cellmate in order to avoid having a roommate. (Doc. 67-6 at 7:8–23, 8:13–17). Defendant Cooper testified that he did not hear Mr. Hardy threaten to kill Mr. Ortiz and that he never thought "in [his] wildest dreams, . . . [that] something like [the attack on Mr. Ortiz] would happen[.]" (Doc. 67-6 at 24:9–11). Even so, Defendant Cooper testified that he reported the threat—indicating that he had some concern about it. (Doc. 67-6 at 15:11–22). Furthermore, two inmates testified that when Defendants Cooper and Bell tried to put Mr. Ortiz in the cell with Mr. Hardy that he screamed and threatened to "kill" Mr. Ortiz and that Mr. Ortiz pleaded not to be put in the cell because Mr. Hardy was on a common prison drug, "strips," and would hurt him—belying the assertion that the threat was simply a ploy for Mr. Hardy to avoid having a roommate. (Doc. 67-9 at 10:16–18; Doc. 72-13 at 9:20–22). Thus, viewing the facts in the light most favorable to the Plaintiff, a reasonable jury could find that Defendant Cooper was subjectively aware of the "facts from which the inference could be drawn that [there was] a substantial risk" that Mr. Hardy would carry out the threat and harm Mr. Ortiz and "also dr[ew] [that] inference[,]" creating an issue for the jury regarding whether he was subjectively reckless under the criminal law. *Rodriguez*, 508 F.3d at 622 (citation omitted).

16

Next, a reasonable jury could find that Defendant Cooper's response to the threat was not reasonable. An "official responds to a known risk [of serious harm] in an objectively unreasonable manner if 'he knew of ways to reduce the harm but knowingly declined to act' or if 'he knew of ways to reduce the harm but recklessly declined to act[,]'" and "it is enough that [Plaintiff show that] the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Rodriguez*, 508 F.3d at 620 (quoting *Hale*, 50 F.3d at 1583); *Farmer*, 511 U.S. at 842 (citations omitted). Defendant Cooper testified that he reported the threat after he placed Mr. Ortiz and Mr. Hardy in a cell together, but there is evidence that, in addition to reporting the threat, Defendant Cooper had the authority to wait to put Mr. Ortiz in the cell after the threat against his life was made while the officer in charge considered the risk of harm. (Doc. 67-5 at 20:4–21:10). At least some officers at CSP were aware that they had this authority. *(*Doc. 67-5 at 20:4–21:10). Thus, a reasonable jury could find that Defendant Cooper knew of ways to reduce a substantial risk of harm to Mr. Ortiz and disregarded that risk.

Furthermore, construing the evidence in the light most favorable to Plaintiff, there was a causal connection between Defendants Cooper and Bell's placement of Mr. Ortiz in the cell with Mr. Hardy and the attack. To show a causal connection, the Plaintiff must prove that the defendant officer "(1) had the means substantially to improve the inmate's safety, (2) knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded." *Nelson*, 89 F.4th at 1298 (quoting *Rodriguez*, 508 F.3d at 622). Given the evidence in the record that Defendants Cooper and Bell had the authority to separate Mr. Hardy and Mr. Ortiz pending consideration of the threat by the officers in charge and similarly situated officers testified that they were affirmatively aware of this authority, a reasonable jury could find that Defendant Cooper knew of other means to reasonably protect Mr. Ortiz, knew that leaving the inmates together after the threat would be insufficient to protect Mr. Ortiz, and disregarded the means available to him to reduce

the risk of harm to Mr. Ortiz. (Doc. 67-5 at 20:4–21:10). Accordingly, Plaintiff has established a constitutional violation.

Finally, as discussed above, it is clearly established law that "an officer violates [the duty to protect] if 'he knows that one prisoner poses a substantial risk of serious harm to another, yet fails to take any [reasonable] action' to separate them." *Nelson*, 89 F.4th at 1299 (alteration in original) (quoting *Caldwell*, 748 F.3d at 1102). Thus, if a jury finds that Defendant Cooper did not act reasonably in response to a known substantial risk of serious harm to Mr. Ortiz, then he would not be entitled to qualified immunity. Accordingly, Defendant Cooper is not entitled to qualified immunity on the failure to protect claim.

## II.    Failure to Intervene Claim Against Defendants Price and Graham

Plaintiff also brings a failure-to-intervene claim against Defendants Graham and Price in their individual capacities. (Doc. 44 ¶¶ 36–37, 48–49; *id.* at 1). Plaintiff alleges that Defendants Graham and Price violated Mr. Ortiz's constitutional rights when they stood "at the cell door window watching" Mr. Hardy assault Mr. Ortiz and failed to intervene and protect Mr. Ortiz. (*Id.*). Defendants Graham and Price assert that they are entitled to qualified immunity from Plaintiff's failure-to-intervene claim. (Doc. 67-1 at 5–13).

"Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence." *Terry v. Bailey*, 376 F. App'x 894, 896 (11th Cir. 2010) (per curiam) (citation omitted). "[I]n order for liability to attach, the officers must have been in a position to intervene." *Id.* (citation omitted). In other words, Defendants Graham and Price can only be held liable if they were "physically able and had a realistic chance to intervene and act in time to protect the inmate Plaintiff." *Seals v. Marcus*, No. 1:11-CV-99 (WLS), 2013 WL 656873, at *7 (M.D. Ga. Jan. 25, 2013) (quoting *Glipsy v. Raymond*, No. 06-14269-CIV, 2009 WL 2762636, at *3 (S.D. Fla. Aug. 28, 2009)), *R&R adopted*, 2013 WL 663579 (M.D. Ga. Feb. 22, 2013); *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986) (instructing the district court to determine on remand "whether or not [the officer defendant] was in a position to intervene"). "The plaintiff has the burden to demonstrate that the defendant was in a

position to intervene but failed to do so." *Ledlow v. Givens*, 500 F. App'x 910, 914 (11th Cir. 2012) (per curiam) (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008)). Furthermore, "no rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence." *Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006).

First, construing the facts in the light most favorable to Plaintiff, Mr. Ortiz suffered a deprivation that was "objectively, 'serious,'" such that Mr. Ortiz was "incarcerated under conditions posing a substantial risk of serious harm[,]" when he was placed—over his objection—in a cell with a violent inmate who threatened to kill him. *Farmers*, 511 U.S. at 834 (citations omitted). Furthermore, Mr. Ortiz suffered a substantial risk of serious harm when Mr. Hardy attacked Mr. Ortiz—the risk of harm that Defendant Graham and Price are alleged to have witnessed. (Doc. 67-2 ¶¶ 20–27; Doc. 72-3 ¶¶ 20–27; Doc. 67-10 at 24:6–25). Accordingly, the Court considers whether (1) Defendants Price and Graham were "subjectively aware that [Mr. Ortiz] was at risk of serious harm"; (2) they "disregarded that risk[,]" (3) they "acted with subjective recklessness as used in the criminal law[,]" and (4) the "necessary causal link" has been established. *Wade*, 106 F.4th at 1255 (citations omitted); *Marbury*, 936 at 1233 (quoting *Rodriguez*, 508 F.3d, at 622–23).

### A. Defendant Price

There is no dispute of fact regarding whether Defendant Price was subjectively aware of the risk to Mr. Ortiz's life. Defendant Price heard Defendant Graham's radio call for assistance. (Doc. 67-2 ¶¶ 25; Doc. 72-3 ¶¶ 25). Defendant Price immediately responded to Graham's radio call reporting the attack and arrived at the J-11 building less than two minutes afterwards. (Ex. O, Surveillance Video, at 6:38:10–15). Once at the scene, she looked through the flap in the cell door and saw Mr. Hardy jumping on Mr. Ortiz's head. (Doc. 67-2 ¶¶ 26–27; Doc. 72-3 ¶¶ 26–27; Doc. 67-10 at 24:6–25). Within seconds of Defendant Price arriving at the cell door, Defendant Graham walked upstairs to the second cell level—leaving Defendant Price as the sole officer to try to stop the attack. (*Id.*; Doc. 67-10 at 22:18–23:24). Price verbally commanded Mr. Hardy several times to stop

attacking Mr. Ortiz, stayed at the cell flap talking to Mr. Hardy until backup arrived, and removed Mr. Hardy from the cell when she had back up. (Doc. 67-2 ¶¶ 26–29; Doc. 72-3 ¶¶ 26–29; Ex. O, Surveillance Video, at 6:38:11–6:40:02).

"An official responds to a known risk [of serious harm] in an objectively unreasonable manner if 'he knew of ways to reduce the harm but knowingly declined to act' or if 'he knew of ways to reduce the harm but recklessly declined to act.'" *Rodriguez*, 508 F.3d at 620 (quoting *Hale*, 50 F.3d at 1583). Defendant Price testified that she did not open the door to physically intervene in the attack because she needed other officers to arrive with the equipment to fend off the attack. (Doc. 67-10 at 42:7–23; Doc. 67-8 at 26:11–27:18). Only sergeants are trained to carry a taser. (Doc. 67-10 at 44:9–13). The sergeant, who arrived two minutes after Price, had pepper spray and a taser, while Defendant Price only had a radio. (*Id.* at 43:20–44:13). Defendant Price explained that "[e]ven if I were to open the door . . . I could have put myself in harm[']s way and the other officer and maybe other inmates if; say he would got a hold of me . . . got my keys . . . . You never know what will happen." (Doc. 67-10 at 42:17–23). From the undisputed evidence in the record, Defendant Price took the steps she knew were available to her while she waited for assistance, staying at the door and issuing verbal commands. (Doc. 67-2 ¶ 26; Doc. 72-3 ¶ 26; Ex. O, Surveillance Video, at 6:38:11–6:40:02).

Furthermore, there is no evidence in the record suggesting or establishing that Defendant Price was "physically able and had a realistic chance to intervene[.]" *Seals*, 2013 WL 656873, at *7 (citation omitted). While Plaintiff argues that Defendants Price and Graham were "weapons trained" there is no evidence that Defendant Price had weapons at the time of the attack or had any other means to insert herself between Mr. Ortiz and Mr. Hardy. (Doc. 72 at 9); *see Ledlow*, 500 F. App'x at 914. Based on the evidence in the record, Defendant Price was the only officer standing outside the cell, was unarmed and facing a large man who seemed "out of his mind" yelling and repeatedly jumping on another man. (Doc. 67-10 at 21:16–25:18). Under similar facts, courts have found that an officer was not in a position to intervene until backup arrived. *See Ledlow*, 500 F. App'x at 914 (affirming summary judgment on failure to intervene claim where officer waited for

another officer before intervening during an attack and Plaintiff "presented no evidence that [Defendant] had the ability to reasonably insert himself between [the inmates] to stop the assault without additional help"); *Seals*, 2013 WL 656873 at *8 (finding that Plaintiff was not in a position to intervene where officers were unarmed and waited to intervene until backup arrived even where dispute remained regarding whether the inmate was armed). Accordingly, Plaintiff has failed to establish that Defendant Price was in a position to intervene but failed to do so and has, thus, failed to establish that Defendant Price violated Mr. Ortiz's Constitutional right. Accordingly, Defendant Price is entitled to qualified immunity.

### B. Defendant Graham

The Parties dispute what Defendant Graham did when Defendant Price arrived on the scene. (Doc. 67-2 ¶ 24; Doc. 72-3 ¶ 24). According to Defendant Graham, she stayed at the door making verbal commands for Mr. Hardy to stop until backup arrived. (Doc. 67-8 at 23:21–24:23). According to Plaintiff, once Defendant Price arrived at the scene, Defendant Graham walked away to finish her daily cell checks. (Doc. 72-3 ¶ 24). Defendant Price testified that Defendant Graham left her alone to face the attack, and the video surveillance shows an officer walking upstairs and away from the attack. (Doc. 67-10 at 21:19–23:24; Ex. O, Surveillance Video, at 6:38:25–6:40:02 PM). Viewing the facts in the light most favorable to Plaintiff, Defendant Graham left Defendant Price alone to stop the attack.

While there is factual dispute about what Defendant Graham did when Defendant Price arrived, this dispute is not material. (*See* Doc. 67-2 ¶ 24; Doc. 72-3 ¶ 24). Construing the facts in the light most favorable to Plaintiff and accepting that Defendant Graham left Defendant Price alone at the door, Plaintiff has presented no evidence that if Defendant Graham had stayed with Defendant Price at the door, that Defendants Price and Graham together were in realistic position to physically intervene in the attack. *See Ledlow*, 500 F. App'x at 914; *Seals*, 2013 WL 656873 at *8. Defendants Graham and Price, two unarmed officers, faced an inmate who the Parties agree was out of control, jumping on the head of Mr. Ortiz, and yelling. (*See* Doc. 67-2 ¶¶ 22, 27; Doc. 72-3 ¶¶ 22,27). Defendant Graham

testified that she and Defendant Price "as two female[] [officers could not] physically restrain" Mr. Hardy. (Doc. 67-8 at 27:12–18). It is Plaintiff's burden to present evidence that Defendants Graham and Price, together, could have intervened, and to dispute the testimony of Defendants Graham and Price. *See Ledlow*, 500 F. App'x at 914. The record is devoid of such evidence. Accordingly, as Plaintiff has failed to establish that Defendants Price and Graham—acting together—would have been in a position to intervene, Plaintiff has failed to establish that Defendant Graham violated Mr. Ortiz's Constitutional right. Accordingly, Defendant Graham is entitled to qualified immunity.

### III. Deliberate Indifference Claim Against Defendant Davis

In the Amended Complaint, Plaintiff brings a deliberate indifference claim against Defendant Davis. (Doc. 44 ¶¶ 32, 45, 52). Defendant Davis argues that he is entitled to qualified immunity because "[t]here is no evidence connecting [Defendant] Davis to this matter beyond working in the dorm where Mr. Ortiz was housed on at least one day (and probably more) while [Mr.] Ortiz and [Mr.] Hardy were cellmates." (Doc. 67-1 at 9).

Defendant Davis worked in the J Building where Mr. Ortiz was housed on at least some of the days between Plaintiff being assigned to a cell with Mr. Hardy and the attack. (Doc. 67-2 ¶¶ 13–14; Doc. 72-3 ¶¶ 13–14). There is no evidence in the record that Defendant Davis was involved in placing Mr. Ortiz in the cell with Mr. Hardy or that he heard any threats against Mr. Ortiz. (*See* Docs. 67-2; Doc. 72-3). Furthermore, Plaintiff does not dispute that Defendant Davis did "not perceive any difficulties between [Mr.] Ortiz and [Mr.] Hardy" while they were cellmates. (Doc. 72-3 ¶ 14). Defendant Davis was on the day shift in Building J on the day of the attack, and Plaintiff does not dispute that Davis was not aware of any difficulties between Mr. Hardy and Mr. Ortiz that day. (Doc. 67-2 ¶¶ 15–16; Doc. 72-3 ¶¶ 15–16). It is undisputed that officers were informed that the attack was happening after Defendant Graham took over for Defendant Officer Davis for the night shift. (Doc. 67-2 ¶ 20; Doc. 72-3 ¶ 20). Thus, there is no evidence on the record

that Defendant Davis was "subjectively aware" of a substantial risk to Mr. Ortiz's safety before and on the day of the attack. *Wade*, 106 F.4th at 1255.

Even if there was evidence that the attack started during Defendant Davis's shift and that Defendant Davis failed in his duty to check on the cells every thirty minutes per CSP procedures, "[t]he failure to conduct . . . cell checks . . . is negligence of the purest form" and "mere negligence [does not] satisfy . . . the . . . 'deliberate indifference standard[.]'" *Goodman*, 718 F.3d at 1332; *Wilson*, 501 U.S. at 305 (recognizing that a showing of negligence will not meet the deliberate indifference standard); (*see* Doc. 72-3 ¶ 14, at 11). Plaintiff has failed to establish that Defendant Davis violated Mr. Ortiz's Constitutional right. Accordingly, Defendant Davis is entitled to qualified immunity.

## CONCLUSION

Accordingly, Defendants' Motion (Doc. 67) is **GRANTED in part** and **DENIED in part**. Defendants Graham, Price, and Davis are dismissed from this action with prejudice.

**SO ORDERED**, this 31st day of March, 2025.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**